UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EVER VARELA, et al., | )<br>)_____<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 10-10186-MLW<br>) |
| | ) |
| E*TRADE BANK, et al., | )<br>) |
| Defendants. | )<br>)<br>) |

REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTION TO DISMISS.

October 22, 2010

SOROKIN, M.J.

On January 7, 2010, the Plaintiffs, Ever Varela and Yesenia Majano, brought this action

in Middlesex Superior Court alleging unfair and predatory lending practices.  On February 5,

2010, the Defendants collectively removed the matter to this Court.[1]  On March 10, 2010, the

Plaintiffs filed an Amended Complaint.  Docket # 5.  The Defendants filed a motion to dismiss

the Amended Complaint in its entirety on April 5, 2010.  Docket # 8.  The Court held a hearing

on the motion on June 28, 2010.  For the reasons set forth below, I RECOMMEND that the

District Judge ALLOW the motion in part and DENY the motion in part.

_____

[1]  The Defendants are E*Trade Bank ("E*Trade"); American Mortgage Network, Inc.,
d/b/a American Mortgage Network of MA ("AmNet"); Wells Fargo Home Mortgage, Inc., d/b/a/
America's Servicing Corporation ("ASC"); and Mortgage Electronic Registration Systems, Inc.
("MERS").

I.      FACTUAL BACKGROUND

The allegations in the Amended Complaint, which the Court must accept as true for present purposes, are as follows.  The Plaintiffs are a husband and wife who reside at 35-37 Heath Street in Everett, Massachusetts.  They purchased this two-family residence on March 4, 2005, for a sale price of $460,000.  On October 26, 2006, the Plaintiffs refinanced the property and entered into two loans, with AmNet and MERS as the nominee trustees.  The first mortgage on the home is an adjustable-rate mortgage in the amount of $400,000.  The initial interest rate on the first mortgage is 6.875 percent, for five years.  On November 11, 2011 (the adjustment date), the rate will be adjusted by adding 2.25 percent to the current LIBOR index.[2]  The interest rate will adjust every year after the adjustment date.  The rate is eligible to rise as high as 12.875 percent, although, according to the Defendants, the interest rate would decline if it was adjusted today, given today's market conditions.

The monthly payment due on the first mortgage before the first adjustment was $2,291.67.  Each of the Plaintiffs received a single copy of the notice of their right to cancel the first mortgage (rather than the required two copies).  In addition, the Good Faith Estimate for the first mortgage discloses a $10 fee for the Flood Certification.  However, the Department of Housing and Urban Development ("HUD-1") Settlement Statement reflects that the Plaintiffs were charged $710 for the Flood Certification.[3]

---

[2]  Although the Plaintiffs do not identify the LIBOR index in the Amended Complaint, "LIBOR" is an acronym for "London Interbank Offered Rate."

[3]  The HUD-1 Settlement Statement was prepared by closing attorney Charles Sammon. On February 17, 2010, three years after the closing, Attorney Sammon sent a check for the $700 difference to the Plaintiffs.

The second mortgage, in the amount of $67,000, has a fixed interest rate of 12.5 percent for fifteen years.  In addition, the second mortgage carries a balloon payment of $58,727.49, to be paid upon the expiration of the fifteen years.  The monthly payment on the second mortgage is $715.07.  The Plaintiffs each received a single notice of their right to cancel the second mortgage.

According to the Plaintiffs, their 2005 Joint Income Tax Return indicates that their adjusted gross income in 2005 was $41,394.00.  This amount yields an adjusted gross monthly income of $3,449.50.  The sum total of the monthly payments on the first and second mortgages before the first adjustment is $3,006.74, which exceeds 80 percent of the Plaintiffs' combined monthly adjusted gross income.  The Plaintiffs argue that the Defendants either did review, or should have reviewed, the Plaintiffs' 2005 tax returns, pay stubs, and other financial information. The Plaintiffs provided pay stubs and their prior year's tax returns to the mortgage broker arranging the transaction.  The terms and conditions of both mortgages created a monthly payment amount that the Plaintiffs could not afford.  However, the Defendants represented to the Plaintiffs that they could afford the combined mortgage payment.[4]

Both Mr. and Mrs. Varela signed a Uniform Residential Loan Application.  Each of these applications reports a gross monthly income of $8,037.50 per month, a number substantially higher than the adjusted gross income reported on the Varela's prior year tax return.  A substantial portion, but not all, of the difference is accounted for by a notation of $2,000.00 per month in "Other" income in the application.  In an affidavit filed in opposition to the Motion to Dismiss, Mr. Varela states that neither he nor his wife are fluent in English, that no documents

---

[4]  The Amended Complaint does not state the specific nature of these representations.

3

were provided to them before the closing, that they were instructed to sign multiple papers at the closing without review and that he "did not know until my current attorneys told me that I had signed a piece of paper indicating that I had an income of over $8,000 per month."  Docket #15-1 at ¶ 25.  Mr. Varela also affirms that he never intended to provide false or incorrect information.

In this affidavit, Mr. Varela also states that he sought a refinancing that would result in a combined monthly payment of no more than $1,500 to $2,000 per month and that the representative of Mass Lending assured him that the loan would achieve such a result, and then informed at the closing that the loan did in fact achieve the result sought.  Mr. Varela concedes that near the end of the closing, the representative informed him that the monthly payment "would be over $3,000" and that the bank had refused to provide the terms Varela sought.  Docket #15-1 at ¶ 19.

Several years later, on July 31, 2009, a document assigning the first mortgage to E*Trade was recorded with the Middlesex County Registry of Deeds.  On September 10, 2009, counsel for the Plaintiffs sent to the Defendants AmNet and MERS a demand letter pursuant to Mass. Gen. Laws ch. 93A.  On January 11, 2010, counsel for the Plaintiffs sent  to AmNet, E*Trade, and MERS a demand letter and exercise of the Plaintiffs' extended right to rescind the mortgages.  None of the Defendants had responded to the demand letters as of the time that the Amended Complaint was filed on March 10, 2010.

The Plaintiffs have been unable to afford the monthly mortgage payments, and E*Trade now seeks to foreclose on the property.  In the Amended Complaint, the Plaintiffs assert the following claims (which are described with more relevant particularity in the discussion):

a.       Count I, against all defendants for violation of the Massachusetts Consumer

Credit Cost Disclosure Act ("MCCCDA"), M.G.L. c. 140D, arising out of the failure to provide two copies of the notices to cancel and the disclosure of a $10 flood zone charge and instead charging $710;

b.    Count II,  against E*Trade, AmNet, and MERS, arising out of  the alleged violations of the MCCCDA in Count I;

c.    Count III, against all defendants for fraudulent misrepresentation;

d.    Count IV and V, against all defendants for violations of 940 CMR 8.06(1) and (15) arising out of the terms of the loans in light of the Varela's circumstances;

e.    Count VI, against all defendants for violation of M.G.L. c. 93A arising out of the allegations supporting Counts IV and V, that the Defendants made loans where they could not have reasonably expected that the Plaintiffs would meet their obligations;

f.    Count VII, against MERS and AmNet only, for violation of M.G.L. c. 93A arising out of the allegations supporting Counts IV and V.

## II.    DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (internal citations and quotations omitted).  See also Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92 (1st Cir.2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

### 1.  Counts I and II

Count I alleges violations of the MCCCDA arising from the Defendants' failure to

5

provide two copies (rather than one) of the Notice of Right to Cancel for each mortgage, and failure to disclose a prepaid finance charge on the first mortgage by only disclosing a $10 charge while actually charging $710 for that line item.  Count II alleges a per se violation of Chapter 93A arising from the Defendants' violations of MCCCDA set forth in Count I.  The Defendants advance one argument in support of dismissal of both of these counts – that the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, et seq., preempts the MCCCDA claim.[5]

Federal preemption of a state law may occur in several different ways: (1) through express language in a congressional enactment; (2) through implication by "the depth and breadth of a congressional scheme that occupies the legislative field" (field preemption); and (3) through implication because of a conflict with a congressional enactment (conflict preemption). Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541 (2001).

The Defendants premise their preemption argument solely on the existence of the TILA exemption that was granted to Massachusetts.  By way of background, the court notes that the Federal Reserve Board has exempted five states, including Massachusetts, from the reach of TILA.  See Belini v. Wash. Mut. Bank, FA, 412 F.3d 17, 28 (1st Cir.2005); Rodrigues v. Members Mortgage Co., Inc., 323 F. Supp. 2d 202, 210-211 (D. Mass.2004) (Saris, J.). See also 12 C.F.R. § 226.29(a)(1) (permitting exemptions to the TILA for states whose laws are substantially similar to federal law).  The exemption makes a creditor subject solely to state law, in this case, the MCCCDA.  See 47 C.F.R. 36962 ("The effect of an exemption is to make creditors (other than federally chartered institutions) subject *solely* to state law and enforcement rather than the comparable federal law and enforcement.") (Emphasis added).  In other words, the

---

[5]  The Defendants advance no separate argument regarding chapter 93A.

TILA is generally not applicable to claims brought in Massachusetts by creditors of non-federally chartered institutions.[6]

The Defendants contend that the Plaintiffs are not entitled to bring claims against them under the MCCCDA because the Regulations provide that the exemption "does not apply to transactions in which a federally-chartered institution is a creditor." 47 C.F.R 42171. However, even assuming, *arguendo*, that AmNet is a federally-chartered institution,[7] the Defendants still have not demonstrated that the TILA preempts MCCCDA as to federally-chartered institutions.

The Defendants' argument in support of preemption is based upon a flawed interpretation of the TILA exemption. If, as the Defendants argue, the exemption does not apply here because AmNet is a federally-chartered institution, it simply means that the Plaintiffs are not required to bring claims <u>solely</u> pursuant to the MCCCDA. The absence of the applicability of the exemption

---

[6] However, this rule is not absolute. As Judge Young has noted,

MCCCDA, M.G.L. c. 140D, §§ 1-35, is TILA's state counterpart. The Federal Reserve Board has granted some exemptions to TILA in Connecticut, Maine, Massachusetts, Oklahoma, and Wyoming. 12 C.F.R. Pt. 226, Supp. I 12 C.F.R. § 226.29(a) ¶ 4. In these few states, as to certain TILA requirements, certain federal provisions have no force and creditors are subject to state requirements that are generally similar to the federal requirements. According to the Federal Reserve Board's regulations, however, the exemption's displacement of federal law in favor of state law is not absolute. 12 C.F.R. § 226.29(b). It is well established that debtors retain at least the ability to file suits for damages in federal court pursuant to 15 U.S.C. § 1640, regardless of the exemption. <u>Belini</u>, 412 F.3d at 20.

<u>Carey v. Long Beach Mortg. Co.</u>, 470 F. Supp. 2d 3, 6 (D. Mass.2007) (Young, J.).

[7] In passing upon a motion to dismiss, the Court may take notice of matters susceptible of judicial notice. <u>Andrew Robinson Intern., Inc. v. Hartford Fire Ins. Co.</u>, 547 F.3d 48, 51 (1st Cir.2008). Whether or not AmNet is a federally-chartered institution is such a matter, however, the internet address provided by the Defendants produced a 'page not found' error when accessed by the Court.

(which exemption essentially permits MCCCDA to replace TILA in Massachusetts as to non-federally-chartered institutions) does not establish preemption standing alone.  It simply means that the Plaintiffs may also be able to bring claims pursuant to the TILA.

Without the exemption, the Defendants must still establish a basis to preempt the MCCCDA.  In this case, there is no other basis for TILA preemption of the MCCCDA.  The TILA contains no express preemption language, nor have the Defendants pointed to any language in TILA from which the Court could reasonably imply the intent to preempt, in the circumstances of a state law imposing a substantially similar standard to measure the Defendants' conduct.  In fact, in granting Massachusetts a rare exemption to TILA for the MCCCDA (one out of only five states that received the exemption), the Federal Reserve has explicitly recognized that the TILA and the MCCCDA are substantially similar.  The First Circuit recently reached the same conclusion:

> Except for a modest variance in regard to the limitation period – a variance that is of no consequence here  – the MCCCDA mirrors its federal counterpart. This is not an accident; the Massachusetts legislature closely modeled the state law after the TILA. It is, therefore, common ground that the MCCCDA should be construed in accordance with the TILA.

McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 422 (1st Cir.2007); See also Desrosiers v. Transamerica Fin. Corp. (In re Desrosiers), 212 B.R. 716, 722 (Bankr. D. Mass.1997) ( "The statutes are substantially the same" except for a statute of limitations difference);  King v. Long Beach Mortgage Co., 672 F. Supp. 2d 238, 241 n. 1 (D. Mass.2009) (Young, J.) ("The MCCCDA is closely modeled on TILA and should construed in accordance with TILA.").  Accordingly, no substantive difference between the two statutes supports conflict preemption; they are substantially the same.

The Defendants raise two other points.  First, they cite <u>Palmer v. Champion Mortgage</u>, No. 04-11954-RCL, a case in which Judge Lindsay entered the following electronic order:

> Judge Reginald C. Lindsay : Electronic ORDER entered granting Defendant's Motion to Dismiss. . . . Furthermore her claims for damages based on an alleged violation of the Truth-in-Lending Act ("TILA") are also time-barred for the reasons argued by the defendant in part III of its brief. Both of the plaintiff's claims under TILA, therefore are dismissed. The plaintiff's claims under Mass. Gen. L. c.140D are preempted by TILA and are likewise dismissed. The clerk shall enter judgment dismissing this action and shall terminate this case upon the court's docket. (Lindsay, Reginald) (Entered: 12/22/2005).

Based upon the foregoing, the Defendants argue that Judge Lindsay determined that TILA preempts MCCCDA claims against a federally-chartered institution.  Notably, Judge Lindsay did not provide an explanation of his reasoning.  The record in the case, however, amplifies the context of his decision.  In the pleadings submitted to Judge Lindsay for his consideration in making the above noted ruling, the Plaintiff had "stipulate[d] that either the MCCDA [sic] may be preempted by the National Banking Act <u>or</u> that [defendant] is not subject to the MCCDA [sic]" and instead sought only a remedy under federal law.  04cv11954-RCL, Opposition to Motion to Dismiss, Docket #14 at 1-2.  Under these circumstances, I find that Judge Lindsay's one-sentence ruling is of limited persuasive authority.

Second, the Defendants do identify one difference between the two statutes – namely, the statute of limitations difference noted by the First Circuit.  All TILA actions for damages must be brought within one year of the occurrence of the alleged violation. 15 U.S.C. § 1640(e).  Actions for rescission under TILA must be brought within three years. 15 U.S.C. § 1635(f).  In contrast, the MCCCDA provides that claims for rescission and/or for damages may be brought within four years of their occurrence.  M.G.L. c. 260, § 5A; M.G.L. c. 140D, § 10.  In this case, the difference may be material.  The closing occurred on October 26, 2006, and the Plaintiffs did not

file suit until January 7, 2010 – more than three, but less than four, years later.

As the Defendants point out, the Ninth Circuit stated  in dicta that "[a]n attempt by [plaintiffs] to go outside the congressionally enacted limitation period of TILA [by asserting a state law claim with a longer limitations period] is an attempt to enforce a state regulation in an area expressly preempted by federal law."  Silvas v. E*Trade Mortgage Corp., 514 F.3d 1001, 1007 n.3 (9th Cir 2008).  The Ninth Circuit's dicta is of limited persuasive authority in the present case.  In Silvas, the Ninth Circuit concluded that federal law "occupie[d] the entire field of lending regulation for federal savings associations," based on an express federal regulation that the Office of Thrift Supervision issued pursuant to authority granted by the Home Owners Loan Act of 1933 [HOLA].  Id. at 1005 (quoting 12 C.F.R. § 560.2(a)).  Accordingly, the Ninth Circuit determined that the federal preemption of the field of lending regulation of federal savings associations left "no room for the States to supplement" including no room for supplementation by a longer period of limitations for a state claim remedying a substantive federal right under TILA."  Id. at 1007 n.3.  That is why the Ninth Circuit qualified the comment cited by the Defendants regarding the TILA limitations period with the language "in an area expressly preempted by federal law."  Id.  The Ninth Circuit was referring to the express field preemption under HOLA which, in this case (unlike Silvas), is not applicable.  See, e.g. Yang v. Home Loan Funding, Inc., 2010 WL 670958 at *10 (E.D.Ca. Feb. 22, 2010) (noting that Silvas applied preemption arising from HOLA which holding has no application in a case in which HOLA is inapplicable). The Ninth Circuit did not consider the question the instant case does raise: whether a state law substantially similar to TILA, but providing a longer limitations period is inconsistent with or in conflict with TILA.

After <u>Silvas</u>, several district courts in the Ninth Circuit have held that "the allegation of violation of TILA under the [California Unfair Competition Law] does not serve to expand the statute of limitations beyond the time period provided in TILA."  <u>Yang</u>, 2010 WL 670958 at *10; <u>Countrywide Home Loans</u>, 2009 WL 2500710 (E.D.Ca. 2009); <u>Champlaie v. BAC Home Loans Servicing</u>, 2009 WL 3429622 (E.D.Ca. 2009).  In large measure these decisions, however, rely upon the language of the Ninth Circuit in <u>Silvas</u> without further analysis.  <u>See</u>, <u>e.g.</u> <u>Countrywide</u> 2009 WL 2500710 at *7 (quoting <u>Silvas</u>, 514 F.3d at 1007 n. 3)("The Ninth Circuit has held that the UCL cannot be used to remedy violations of a time-barred TILA claim.")

Despite the language in the above cited cases, I recommend that the Court determine that, in this case, the Plaintiff's claims under Count I and II are not preempted.  In contrast to HOLA, TILA does not preempt the field.  <u>See</u>  <u>Plascencia v. Lending 1st Mortgage</u>, 583 F.Supp.2d 1090, 1099 (N.D.Cal.2008) ("the fact that the [state statute] allows a claim to be brought within four years or may provide remedies not available under TILA . . .  simply provides an additional level of protection for consumers. The [state statute] does not mandate additional disclosures that are substantively inconsistent with TILA's, and therefore does not bring the UCL within the scope of TILA's preemption proviso"); <u>Amparan v. Plaza Home Mortg., Inc.</u>, 678 F.Supp.2d 961, 977 (N.D. Cal.2008) (following <u>Plascencia</u>); <u>See</u> <u>also</u> <u>Romero v. Countrywide Bank, N.A.</u>, 2010 WL 2985539 at *16-17 (N.D. Cal.2010) (Claims under state law which were based on alleged TILA disclosure violations were not preempted by TILA, since state law did not impose disclosure requirements that were substantively inconsistent with TILA and TILA did not expressly preempt).  Accordingly, this is not a basis for federal preemption of a supplementary broader limitations period provided by state law for a violation of a state law substantive standard

that mirrors the equivalent federal substantive standard.  There is no direct conflict, in this case, between the state law and TILA.   And an analysis of the statute suggests that permitting claims to proceed under the longer limitations period authorized under Massachusetts law does not conflict with or thwart Congress' objectives in enacting TILA.

TILA contains a savings clause; it provides:

> this subchapter do[es] not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of this inconsistency.

 15 U.S.C. § 1610.

Several reasons suggest that the Massachusetts law under which the Plaintiff sues is not "inconsistent" with TILA and thus not preempted.[8]  First, the Federal Reserve has issued binding regulations defining when a state law is "inconsistent" with the provisions of TILA concerning credit transactions: "A State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law."  12 C.F.R. § 226.28(a). Because the Massachusetts statute imposes no additional or different substantive requirement than the federal statute, it is not "inconsistent" under this definition.   In short, the state law does not require a creditor to make a disclosure or take an action that contradicts the requirements of Federal law.  This interpretation of TILA by the Federal Reserve, the agency charged by Congress to enforce TILA, is entitled to deference. See Ford Motor Credit Co. v. Milhollin,

---

[8]  No party has argued that the allegations at issue concern something other than the disclosure of information in connection with credit transactions, and the allegations do concern that topic. If they did not, than neither the statute nor preemption would apply. Yang, 2010 WL 670958 at *10 (noting that claims of fraud arising from oral statements are outside the scope of § 1610 and are not preempted).

444 U.S. 555, 566 (1980) (The traditional acquiescence to the interpretation given a statute by the agency charged with its administration "is particularly apt under TILA, because the Federal Reserve Board has played a pivotal role in "setting [the statutory] machinery in motion" and because "Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA. The Act is best construed by those who gave it substance in promulgating regulations thereunder").

Second, regarding other provisions of TILA not applicable to Counts I and II (the correction of billing errors and the regulation of credit reports), the Federal Reserve defined "inconsistent" more broadly to include "rights, responsibilities, or procedures . . . that are different from those required by the Federal Law." 12 C.F.R. § 226.28(a)(2)(I). While the Federal Reserve preempted different "procedures" in this context, something that might encompass a longer state limitations period, it did not do so regarding credit transactions. Moreover, even when preempting differing procedures, the Federal Reserve exempted from preemption state laws that impose on a creditor "an obligation to respond . . . after the time allowed in the Federal law," id., has expired suggesting that longer limitations period are not preempted.

Third, several courts have disagreed with those decisions cited by the Defendants. In Romero v. Countrywide Bank, 2010 WL 2985539 (July 27, 2010 N.D.Cal.), the court rejected the argument that TILA preempts supplementation of TILA's remedies by way of a state law claim with a longer limitations period. The Court found that the "defendants' argument regarding the 'supplementation' of TILA's framework rests on a misapplication of Silvas and conflates field and conflict preemption." Id. at *17. Thus, the court determined that as long as

the requirements the plaintiffs ultimately seek to impose are not inconsistent with or contradictory to TILA, the claims may proceed despite a longer state limitations period.  Id. at *18.  See also Plascencia II, 583 F.Supp.2d at 1099. Fourth, construing a federal statute in another area of law which preempted state laws imposing "requirements . . . in addition to or different from" those under federal law, the Supreme Court determined that the "imposition of state sanctions for violating state rules that merely duplicate federal requirements" is consistent with the statute.  Bates v. Dow Agrosciences, 125 S.Ct. 1788, 1797 (2005).  Thus, the Supreme Court permitted states to create additional remedies for violations of the federal standard.  Id. at 1800.  This approach to preemption in a statute which like TILA did not preempt the field, supports the conclusion that a state law authorizing a longer limitations period for violation of a state substantive rule that is substantially the same as the federal rule is neither inconsistent with nor in conflict with federal law.

Finally, I note that the Bankruptcy Court permitted a claim such as the present one to proceed after the expiration of the federal statute of limitations, although it did so without a preemption analysis.  See In re Vincent, 381 B.R. 564, 571, 573 (Bkrtcy. D. Mass. 2008). Therefore, I recommend that the Court DENY the motion to dismiss as to Counts I and II.

2.      Counts III through VII

A.  National Bank Act Preemption

Next, the Defendants argue that Counts III through VII are preempted by the National Bank Act ("NBA"), 12 U.S.C. § 1, et seq., and regulations promulgated thereunder by the Office

14

of Comptroller of Currency ("OCC").[9]  Here, the Defendants appear to argue that the NBA

preempts the state laws at issue here because they are contrary to federal law.[10]   Contrary to the

Defendants' contention, Counts III through VII do <u>not</u> challenge the legality of the mortgages

generally, or the legality of the methods used to determine affordability, but rather contend that

these two mortgages for these two plaintiffs were not reasonably affordable.  As explained

below, these claims (properly characterized) are not preempted.

The Defendants correctly note that in the banking context, the Supreme Court has

"interpreted grants of both enumerated and incidental powers to national banks as grants of

authority not normally limited by, but rather ordinarily preempting, *contrary* state law." <u>Watters</u>

<u>v. Wachovia Bank, N.A.</u>, 550 U.S. 1, 12 (2007) (internal quotation marks omitted) (emphasis

added).  However, federally chartered banks remain "subject to state laws of general application

in their daily business to the extent such laws do not conflict with the letter or the general

purposes of the NBA." <u>Id</u>. at 11.  That is, "[s]tates are permitted to regulate the activities of

national banks where doing so does not prevent or significantly interfere with the national bank's

or the national bank regulator's exercise of its powers." <u>Id</u>. at 12.  As the First Circuit has noted,

---

[9]As previously noted, these counts includes claims of (1) fraudulent misrepresentation
(Count III, against all defendants); violation of 940 CMR 8.06(1) and (15) (Counts IV and V);
violation of M.G.L. c. 183C, § 4 (Count VI); and violation of M.G.L. c. 93A (Count VII).

[10]  The Defendants state that at the time of the Plaintiffs' transaction, AmNet was a
wholly owned subsidiary of Wachovia Bank N.A., a National Association federally chartered
with the OCC.   The Defendants note that the Supreme Court has indicated that it has "treated
operating subsidiaries [such as AmNet in the present case] as equivalent to national banks with
respect to powers exercised under federal law (except where federal law provides otherwise)."
<u>Watters v. Wachovia Bank, N.A.</u>, 550 U.S. 1, 18 (2007). The Court accepts as true for purposes
of this motion only, that each of the Defendants has standing to assert NBA preemption as a
defense.

> [t]he National Bank Act provides that a nationally chartered bank shall have the power "[t]o exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24, Seventh. The Supreme Court has consistently recognized this grant of incidental powers as a grant[ ] of authority not normally limited by, but rather ordinarily pre-empting, *contrary* state law. Thus, a state law may be preempted by the National Bank Act when it frustrates or limits the ability of a national bank to exercise its statutorily granted powers. See Barnett Bank, 517 U.S. at 33-34, 116 S.Ct. 1103.

SPGGC, LLC v. Ayotte, 488 F.3d 525, 531 (1st Cir.2007) (internal citations omitted, emphasis added).

Pursuant to Ayotte, there is a two-step process to determine whether the NBA preempts Massachusetts law.  First, the Court must determine whether a national bank's enumerated and incidental powers include real estate lending.[11]  That the NBA grants this power to national banks is beyond dispute.  The NBA specifically grants the power to national banks to "make, arrange, purchase or sell loans or extensions of credit secured by liens in real estate, subject to . . . such restrictions and requirements as the Comptroller of Currency may prescribe by regulation or order."  12 U.S.C. § 371(a).  Indeed, the OCC has promulgated several regulations with the purpose of "set[ting] forth standards for real estate-related lending and associated activities by national banks."  12 C.F.R. § 34.1(a).  For example, the OCC has indicated that a bank "may use any reasonable method to determine a borrower's ability to repay, including, for example, the borrower's current and expected income, current and expected cash flows, net worth, other relevant financial resources, current financial obligations, employment status, credit history, or

---

[11] Note that the Defendants state in their Reply that "[i]f Massachusetts law were to provide differently [from the NBA], and Plaintiffs have not established that it does, it would be preempted."  Reply at 3.  This statement, however, ignores the fact that the law imposes the burden to show preemption on the Defendants, not the Plaintiffs.  Somes v. United Airlines, Inc., 33 F. Supp. 2d 78, 83 (D. Mass.1999) (Lasker, J.).

other relevant factors." 12 C.F.R. § 34.3(b).  Therefore, the Court finds that a national bank clearly has the powers to engage in real estate lending.

The next step is to determine whether the MCCCDA places any limits on the bank's ability to exercise those powers.  In Ayotte, the First Circuit held that the NBA preempted the New Hampshire Consumer Protection Act, which banned the sale of gift cards with a face value of $100 or less containing an expiration date.  Ayotte, 488 F.3d at 533.  The First Circuit ruled that the New Hampshire law was preempted because the NBA specifically allows for stored-value gift cards to include expiration dates.  Id.  In that case, there was obviously a direct conflict between the state law and the NBA, as the state law prohibited conduct that was expressly allowed by the federal statute.

The present case can be distinguished from Ayotte because the Defendants here do not cite to any provisions in the Massachusetts laws and regulations at issue here that are a direct affront to federal law.  At the outset, the Court notes that the NBA explicitly recognized the applicability to national banks of general state laws in the areas of, *inter alia*, consumer protection and fair lending:

> The laws of the host State regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches shall apply to any branch in the host State of an out-of-State national bank to the same extent as such State laws apply to a branch of a bank chartered by that State, except-- (I) when Federal law preempts the application of such State laws to a national bank; or (ii) when the Comptroller of the Currency determines that the application of such State laws would have a discriminatory effect on the branch in comparison with the effect the application of such State laws would have with respect to branches of a bank chartered by the host State.

> 12 U.S.C. § 36(f)(1)(A).

Moreover, in an Advisory Letter, the OCC has noted that

> Generally, a deceptive act or practice involves a representation or omission that is likely to mislead a reasonable consumer in some material way. Whether particular conduct constitutes an unfair act or practice would depend on the particular facts and circumstances presented, but generally would involve acts or practices that are unscrupulous, unconscionable, or contrary to public policy, and that harm consumers.  The consequences of engaging in practices that may be unfair or deceptive under federal or state law can include litigation, enforcement actions, monetary judgments, and harm to the institution's reputation.

OCC Advisory Letter 2002-3 (Mar. 22, 2002).

That a national bank could be liable under state law is consistent with Watters, 550 U.S. at 11 ("Federally chartered banks are subject to state laws of general application in their daily business.").

The state regulations at issue are quite similar to federal regulations.  The federal regulations state that a national bank "shall not make a consumer loan . . . based predominantly on the bank's realization of the foreclosure or liquidation value of the borrower's collateral, without regard to the borrower's ability to repay the loan according to its terms."  12 C.F.R. § 34.3(b).  Similarly, 940 CMR 8.06(15), a violation of which is asserted in Count V, provides that

> (15) It is an unfair or deceptive act or practice for a mortgage broker to arrange or mortgage lender to make a mortgage loan unless the mortgage broker or lender, based on information known at the time the loan is made, reasonably believes at the time the loan is expected to be made that the borrower will be able to repay the loan based upon a consideration of the borrower's income, assets, obligations, employment status, credit history, and financial resources . . . .

940 CMR 8.06(1) states that "It is an unfair or deceptive act or practice for a mortgage broker or lender to make any representation or statement of fact if the representation or statement is false or misleading or has the tendency or capacity to be misleading, or if the mortgage broker or lender does not have sufficient information upon which a reasonable belief in the truth of the representation or statement could be based. Such claims or representations include, but are not

18

limited to the availability, terms, conditions, or charges, incident to the mortgage transaction and

the possibility of refinancing . . ."  940 CMR 8.06(1).

> M.G.L. c. 183C, a violation of which is asserted in Count VI,  states in pertinent part that

> A lender shall not make a high-cost home mortgage loan unless the lender
> reasonably believes at the time the loan is consummated that 1 or more of the
> obligors, will be able to make the scheduled payments to repay the home loan
> based upon a consideration of the obligor's current and expected income, current
> and expected obligations, employment status, and other financial resources other
> than the borrower's equity in the dwelling which secures repayment of the loan.

M.G.L. c. 183C, § 4.

> Finally, Chapter 93A specifically provides that it should be interpreted in a manner not

"inconsistent with the rules, regulations and decisions of the Federal Trade Commission . . ."

M.G.L. c. 93A, § 2.  The NBA, in turn provides that "[a] national bank shall not engage in unfair

or deceptive trade practices within the meaning of section 5 of the Federal Trade Commission

Act and regulations promulgated thereunder."  12 C.F.R. § 34.3(c).

> The Defendants simply state that the Plaintiffs' claims are preempted because "they

would frustrate and limit the enumerated or incidental powers Congress and the OCC afforded to

Wachovia Bank, N.A. and its mortgage operating subsidiary, AmNet."  Docket # 9 at 8.

However, the Defendants do not point to even a single provision of state law that conflicts with

federal law.[12]

---

[12]   The Defendants note that the OCC has authorized that a national bank and its
subsidiaries to make (Adjustable Rate Mortgage ("ARM") loans "without regard to any State law
limitations on those activities."  12 C.F.R. § 34.21.  The Defendants insist that "OCC's
regulations allow national banks to offer ARM loans with the precise characteristics of AmNet's
LIBOR-indexed ARM product."  Docket #9 at 5.  While this may be a correct statement of the
law, it has no bearing on this case because the Plaintiffs are not claiming that ARM loans are per
se prohibited.  Rather, the Plaintiffs' claims focus on the alleged fraud/misconduct that led to
their particular loan.  In addition, the Defendants argue (in response to the Plaintiffs' allegation

In a similar case alleging violations of California's consumer protection law, the court rejected the Defendant's argument that OCC regulations preempted the plaintiff's claims. See Jefferson v. Chase Home Finance, 2008 WL 1883484 (N.D.Cal. April 29, 2008).  In that case, the court noted that although the OCC regulations provided that banks could make real estate loans without regard to state law limitations regarding terms of credit, disclosure and advertising, processing and servicing of mortgages, repayments, and rates of interest,  the plaintiff's allegations were made under laws of "general application" like the [California consumer protection act], "which merely require all business (including banks) to refrain from misrepresentations and abide by contracts and misrepresentations to customers [,] [and] do not impair a bank's ability to exercise its lending powers." Id. at *10. Because they only "incidentally affect" the exercise of a Bank's power, the court held, they "do not fall into the enumerated categories of § 34.4(a), and are therefore not preempted." Id. The Court finds this reasoning persuasive.

As the Plaintiffs note, Massachusetts law essentially parallels federal law and is no more stringent or burdensome than federal law.  Therefore, the court finds that Counts III through VII should not be dismissed on the basis of NBA preemption.

B. Timeliness of Count III

Next, the Defendants argue that the Plaintiffs' claim for fraudulent misrepresentation (Count III) is time-barred.  Specifically, they allege that the Defendants fraudulently represented

---

that their tax returns indicated that their monthly income was $3,449.50) that OCC regulations do not require banks to only consider adjusted gross income from past tax returns.  Rather, they are permitted to use "any reasonable method" to determine a borrower's ability to repay.  Docket # 9 at 7, quoting 12 C.F.R. § 34.3(b).  The Plaintiffs, however, are not claiming that there is one particular permissible evaluation method.

to the Plaintiffs that the Plaintiffs could afford the combined monthly payment required by the two mortgages.  In Massachusetts, actions in tort must be filed "within three years next after the cause of action accrues."  M.G.L. c. 260, § 2A.  The Plaintiffs entered into the loans on October 26, 2006, and did not bring this action until January 7, 2010, which is more than three years after the closing.

The Plaintiffs argue that their cause of action did not accrue until they knew that they could not afford the combined payments of their two mortgages.  In fact, the cause accrues when the Plaintiffs knew or should have known, that they could not afford the combined payment.  As the First Circuit has noted, under the "discovery rule," a claim accrues once

> a plaintiff knows or has sufficient reason to know of the conduct upon which the claim is grounded. In the absence of actual knowledge-and there is no allegation of such knowledge in the complaint-the question becomes when a reasonably prudent person in the plaintiff's shoes would have discovered (that is, would have acquired an awareness of) the [injury]. . . . One thing is clear . . .: the reasonable person standard incorporates a duty of diligence. It is not a barrier to accrual that a plaintiff has failed to discover a cause of action if a reasonably diligent person, similarly situated, would have made such a discovery. In other words, a plaintiff can be charged with inquiry notice, sufficient to start the limitations clock, once he possesses information fairly suggesting some reason to investigate whether he may have suffered an injury at the hands of a putative infringer.

Warren Freedenfeld Associates, Inc. v. McTigue, 531 F.3d 38, 44-45 (1st Cir.2008) (internal citations omitted).

The First Circuit cautions that the district court should not dismiss a claim for statute of limitations reasons at the motion to dismiss stage unless there is "no doubt that an asserted claim is time-barred," LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir.1998).  At the time of the closing for the transactions at issue in this case, a reasonably prudent person would have discovered his or her inability to afford the combined monthly payment.  Indeed, the

Plaintiffs advance no allegation nor argument regarding a later development leading to the discovery of the inability to afford the payments.  In a similar case, the First Circuit ruled that "the inquiry is over before it begins . . .  the documents contained all of the information necessary . . .  It was attorney consultation, rather than newly-discovered information, that prompted plaintiffs' lawsuit."  <u>Salois v. The Dime Savings Bank of N.Y.</u>, 128 F.3d 20, 26 (1st Cir.1997).  At the time of the closing, the Plaintiffs were cognizant of their own financial condition and of the amount of the combined monthly payment.  Indeed, Mr. Varela affirmed in opposition to the Motion to Dismiss that he was informed at the closing that his payment would exceed $3,000.  The Plaintiffs knew, or reasonably should have known, of their inability to pay the combined monthly payment at the time of the closing.

Even if one construes the Count as asserting that the Plaintiffs were fraudulently induced into believing the combined mortgage payment was affordable by virtue of the approval and issuance of the loans by the Defendants (presumably based upon the $8,000 per month figure), the claim is untimely.  The Plaintiffs knew all they needed to know about whether they could afford the loan on the day of the closing.

I recommend that the Court <u>ALLOW</u> the Defendants' motion and dismiss Count III as time-barred.

### C.  <u>Failure to Plead Fraud with Specificity - Count III</u>

In any event, if the Court finds that Count III is not barred by the Statute of Limitations, I recommend that the Court dismiss Count III for the Plaintiffs' failure to plead fraud with particularity.  Under Massachusetts law, a claim for intentional misrepresentation requires proof of four elements: (1) the defendant made a false misrepresentation of material fact, (2) the

defendant acted with knowledge of its falsity, (3) the defendant acted with the purpose of inducing the plaintiff to act on the misrepresentation and (4) the plaintiff relied on the misrepresentation to her detriment. Zuckerman v. McDonald's Corp., 35 F. Supp. 2d 135, 144 (D. Mass.1999) (Ponsor, J). Pursuant to Fed.R.Civ.P. 9(b), claims of fraud, unlike most other claims, must be plead with particularity. Under that heightened standard, a plaintiff must identify the fraudulent statement or representation, the person making the statement, and when the statement was made. See Rodi v. S. New England Sch. of Law, 389 F.3d 5, 15 (1st Cir.2004). See also Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir.2004) (Plaintiff must specify the "who, what, where, and when of the allegedly false or fraudulent representation."). Even though the fraudulent misrepresentation claim is asserted under Massachusetts law, Rule 9(b) applies. See Gwyn v. Loon Mountain Corp., 350 F.3d 212, 218 (1st Cir.2003) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). Notably, the Plaintiffs did not dispute the applicability to Count III of the particularity requirement. See Docket #12 at 11-12.

Here, the Plaintiffs' fraud claim appears to rest entirely on a one-sentence allegation in the Amended Complaint, asserting only that "Defendants represented to Plaintiffs that they could afford the combined Mortgage payment." Docket # 5 at ¶ 25. This falls woefully short of the specificity required by Rule 9(b). The Plaintiffs offer no facts to identify which of the Defendants (or their representatives) gave such assurances, nor do they specify what precisely was told to them. Notwithstanding the Plaintiffs' assertion without citation (Docket #12 at 12), the Plaintiffs also failed to allege when the alleged misrepresentations were made. Accordingly, I recommend that Count III be DISMISSED, in the alternative, because it fails to plead fraud with specificity.

D.  <u>Failure to Plead Fraud with Specificity - Counts IV to VII</u>

In their allegations pertinent to Count IV, the Plaintiffs claim that the Defendants:  (1) misinformed the Plaintiffs that the loan would be affordable; (2) inadequately disclosed the ARM payment; (3) misled the Plaintiffs regarding the terms and conditions; and (4) induced the Plaintiffs to pay money in reliance on the misrepresentations.  <u>See</u> Docket # 5 at ¶ 52(a)-(d). Allegations 1, 3 and 4 sound in fraudulent misrepresentation.  Accordingly, Rule 9(b)'s specificity requirements apply and the allegations of Count IV fail for the same reasons as Count III noted above. Therefore, I recommend that Count IV be DISMISSED insofar as prongs 1, 3, and 4.

Rule 9(b) does not apply to Counts V-VII. With regard to Count V, the Plaintiffs allege that the Defendants engaged in unfair and deceptive conduct by (1) making excessively risky and unfair/unconscionable loans; (2) failing to account for the Plaintiffs' ability to make mortgage payments; and, (3) making a loan secured by the Plaintiffs' principal residence when the Defendants could not have reasonably believed that the Plaintiffs would be able to make the payments.  Docket # 5 at ¶ 54(b)-(c).  These allegations sound in unfair conduct, not fraud.  In Count VI, the Plaintiffs allege that the Defendants made loans when they could not have reasonably expected that the Plaintiffs could meet their obligations.  Docket # 5 at ¶ 57.  Again, this allegation does not sound in fraud.  Finally, the same reasoning applies to Count VII, which asserts violations of Chapter 93A.  The Plaintiffs claim that the Defendants (1) made an exceptionally risky and unfair loan; (2) failed to account for the Plaintiffs' ability to repay the loans; and, (3) proposed mortgage terms that were excessive in light of the information contained on the Plaintiffs' tax return.  Docket # 5 at ¶ 61(a)-(c).  Because none of these three claims sound

in fraud, Rule 9(b)'s specificity requirements are inapplicable and I RECOMMEND that the Court DENY the Motion to Dismiss on this ground.

        D. <u>Failure to State a Claim</u>

        The Defendants also argue that Counts III through VII do not state plausible claims for relief under <u>Iqbal</u>, 129 S. Ct. 1937.  The Defendants argue that the allegations in Counts III through VII essentially allege that the Defendants made "an exceptionally risky loan that is unfair."  Docket # 5 at ¶ 61.  In support of their argument that the Plaintiffs have failed to state a claim in Counts III through VII, the Defendants attempt to distinguish the loans at issue in the present case from those that were found to be unfair in a recent case before the Massachusetts Supreme Judicial Court ("SJC"), <u>Commonwealth v. Fremont Investment & Loan</u>, 452 Mass. 733 (2008).  In that case, the Massachusetts Attorney General brought a consumer protection action against a mortgage lender and won a preliminary injunction that restricted the lender's ability to foreclose on loans that were "presumptively unfair."  <u>Id</u>. at 734-735.  The SJC noted that

> the [Superior Court] judge determined that the Attorney General was likely to prevail on the claim that Fremont's loans featuring a combination of the following four characteristics qualified as "unfair" under G.L. c. 93A, § 2: (1) the loans were ARM loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty (defined by the judge as greater than the "conventional prepayment penalty" defined in G.L. c. 183C, § 2) or a prepayment penalty that extended beyond the introductory rate period.

        <u>Id</u>. at 739.

        After a comprehensive review, the SJC affirmed the grant of the preliminary injunction

and remanded the matter for further proceedings.  See id. at 752.

The Defendants argue that the instant claims should be dismissed because the loans at issue in this case are distinguishable from those at issue in Fremont.  The Defendants first argue that the present loans do not contain a "teaser rate" (i.e., where the introductory interest rate inflates into an unaffordable rate).  The Defendants embark on a rather lengthy discussion of the rates at issue here:

> [T]he initial fixed rate of the AmNet first mortgage is 6.875% and the fully indexed rate is 7.625%, a difference of only 3/4 of one percent, calculated as follows.  The first mortgage loan's rate index was the 1-Year LIBOR, which at the time of the loan's inception was 5/3348%.  (Compare Adj. Rate Note at § 4(B), Exhibit C with 1 Year LIBOR Chart, October, 2006, at Exhibit E.)  The loan's "rate add" was 2.250%, which would create a sum rate of 7.5848%.  (Adj. Rate Note at § 4(c), Exhibit C.)  The rate is then rounded to the nearest one-eighth of a percentage point, leaving a fully indexed rate of 7.625%.  (See id.)  Subtracting the initial fixed rate of 6.875% from the fully indexed rate of 7.625% yields a difference of only .75%, far less than a 3% or greater potential adjustment that the [SJC] expressed concern with in Fremont.

Docket # 9 at 15.

The Defendants also argue that the Plaintiffs' payment amount does not change until 2011, and argue that if the trend of LIBOR rates of the past year continues, the Plaintiffs' payments may actually decrease in 2011.

Next, the Defendants quarrel with the Plaintiffs' portrayal of their monthly income.  The Defendants note that although the Plaintiffs state in the Amended Complaint that their monthly income was $3,449.50, their tax return for the prior year (2005) shows that their wages were $4,494.58 per month.  Moreover, the loan applications, which were signed by the Plaintiffs, indicate that their monthly income was $8,037.50.  Finally, the Defendants argue that based upon the size of the mortgages and the property's appraised value, the loan-to-value (LTV) ratio of the

property was 93.4%, whereas the LTV ratio mentioned in <u>Fremont</u> was 100%.

Here, the Defendants are making arguments that go to the merits of the allegations, rather than to whether the Plaintiffs have adequately stated a claim. The Defendants' attempt to distinguish the loans at issue in this case from the characteristics of the loans that were found to be cause for concern in <u>Fremont</u> is more appropriate for the summary judgment stage. <u>Fremont</u> did not purport to set a <u>per se</u> standard against which courts could in all cases make determinations as a matter of law regarding the fairness of a loan. Moreover, in this case, the Plaintiffs challenge not the terms of the loans per se , but rather whether these individual Plaintiffs could reasonably afford the loans.

One other issue bears comment here. The Plaintiffs raise their unaffordability claim in the context of a monthly income of $3,449.50. Their gross wages in their tax return, however, were $4,494.58, and more importantly the loan applications, signed by the Plaintiffs, represent a monthly income of just over $8,000. Ordinarily, parties are bound by the documents they sign, <u>Cohen v. Santoianni</u>, 330 Mass. 187, 193 (1953), although, under Massachusetts law an individual is not bound by documents if one's signature was obtained by fraud. <u>St. Fleur v. WPI Cable Systems/Mutron</u>, 450 Mass. 345, 356 (2008)(citing <u>Freedley v. French</u>, 154 Mass. 339, 342 (1891)). The Plaintiffs claim such a circumstance here, contending that they never made the $8,000 representation, no one told them of it and that the documents were not fully explained or shown to them when they signed at the closing. As the Defendants point out, the question focuses more on their perspective: whether they are responsible for the alleged fraud and misrepresentation on the application and, if not, whether they could rely upon the face of the documents. Because these issues have not been fully developed in the record on the motion to

dismiss and as they appear to present issues more accurately resolved on the fuller record of summary judgment, I recommend that the Court permit the claims to proceed.

Therefore, I RECOMMEND that the motion to dismiss be <u>DENIED</u> on the basis of failure to state a claim.

3.  <u>MERS</u>

Finally, the Defendants argue that the case should be dismissed as against MERS because there are no allegations that it was involved in any of the activities alleged in the Complaint. However, although the Defendants argue that the claims cannot be brought against MERS because it is a mere nominee, the Plaintiffs note that under the terms of the mortgages, MERS as nominee has the right, *inter alia*, to foreclose on the property at issue.  The court notes that Judge O'Toole has allowed Chapter 93A claims to proceed against MERS as nominee.  <u>See</u> <u>McDermott v. Mortgage Electronic Registration Systems, Inc.</u>, 2009 WL 1298346, at *4 (D. Mass.  May 11, 2009).

At this stage of the proceedings, it is premature to dismiss claims against MERS simply because it is a nominee.  If MERS had the right to foreclose on the property, it certainly would be a relevant actor, and the Plaintiffs are entitled to pursue their claims.

III.    CONCLUSION

For the foregoing reasons, I recommend that the Court ALLOW in part and DENY in part the Motion to Dismiss (Docket # 8).  I recommend that the Court ALLOW the motion as to Counts III and IV prongs (1), (3) and (4).  I also recommend that the Court allow the Plaintiffs an opportunity to amend their Complaint to comply with the sufficiency-of-pleading requirements for fraud.  In addition, I recommend that the Court DENY the motion as to Counts I, II, IV prong (2), V, VI, and VII.[13]

             /s / Leo T. Sorokin
             UNITED STATES MAGISTRATE JUDGE

---

[13]  The Parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).